

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Charles Austin*  *Suite 400*  *DIRECT: 410-209-4989*
*Assistant United States Attorney*  *36 S. Charles Street*  *MAIN: 410-209-4800*
*Charles.Austin@usdoj.gov*  *Baltimore, MD 21201-3119*  *FAX: 410-962-0717*

January 15, 2021

The Honorable Richard D. Bennett
United States District Judge
U.S. Courthouse
101 W. Lombard Street
Baltimore, Maryland 21201

     Re:   *United States v. Antoine Rich*
            Crim. No. RDB-19-0506

Dear Judge Bennett:

    The government submits this memorandum in anticipation of the January 21, 2021 sentencing in the above-captioned case. For the reasons discussed below, the government recommends a sentence of no less than 72, but up to 87, months' imprisonment.

### INTRODUCTION AND PROCEDURAL HISTORY

    On October 24, 2019, a federal grand jury in the District of Maryland returned an indictment charging Antoine Rich and four other individuals with two Hobbs Act violations: Conspiracy to Interfere with Commerce by Robbery (Count One) and Interference with Commerce by Robbery (Count Two), both in violation of 18 U.S.C. § 1951(a). ECF No. 1. On November 7, 2019, the grand jury returned a superseding indictment adding a sixth individual to the substantive robbery charged in Count Two. ECF No. 8.[1] On November 5, 2020, Mr. Rich pleaded guilty to Count Two of the First Superseding Indictment, Interference with Commerce by Robbery. ECF 111. The written plea agreement between the parties contemplated a sentence between 60 and 87 months, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). *Id.* at ¶¶ 9-10.

### SENTENCING PROCEDURE

    In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth a multi-step process for imposing sentence in a criminal case. *Id.* at 51-52. A sentencing court should begin by correctly calculating the applicable guidelines range. *Id.* at 49. After providing the parties with an opportunity to present argument, the district court should then consider the factors set forth in

---

[1] In July 2020, the grand jury returned a second superseding indictment, which added a seventh defendant to the Hobbs Act counts and also charged two of Mr. Rich's co-defendants with firearms violations under 18 U.S.C. § 924(c).

18 U.S.C. § 3553(a).  *Id.* at 49-50; *see also United States v. Diosdado-Star*, 630 F.3d 359, 363 (4th Cir. 2011).

### FACTUAL BACKGROUND

On April 25, 2019, Antoine Rich and six other individuals committed an armed home invasion that involved physically restraining one victim and physically assaulting an eight-month pregnant woman, all in front of the victims' seven-year-old child.  Mr. Rich and his accomplices met at Wal-Mart parking lot in Abingdon, Maryland.  At that parking lot, Mr. Rich and the others consolidated from three to two vehicles and drove almost one hour to the victims' residence in Cecil County, Maryland.  After the cars parked at a school near the victims' apartment complex, Mr. Rich and four others exited the vehicles and walked to the adjacent apartment complex at about 5:30 p.m.  Contrary to the representation in the defense letter, the hood on his sweatshirt was up and over his head, like all but one of his fellow intruders.  As seen later on internal video, multiple defendants wore latex gloves.  The victims lived in a second-floor apartment.  Video surveillance captures the group walking up the stairs and Mr. Rich remaining, initially, in the stairwell to act as a lookout for any witnesses or passersby.





Mr. Rich's associates knocked on the door, forced their way inside, and immediately restrained the adult male inside and threatened both adults inside if the victims did not say "where the money at," as one defendant demanded. The adult male, JM (known to at least one intruder to sell controlled substances), answered the door while his significant other, KC, sat at the table doing homework with their minor child. Within seconds of the knock, JM found himself in a headlock, with a gun pointed at his head by one intruder.



KC—approximately eight months pregnant—found herself staring down the barrel of a firearm brandished by another intruder, as she shielded her son and screamed for the intruders to leave. Upon attempting to help JM, KC was kicked her in the abdomen, no doubt obviously enlarged and visible due to her pregnancy.



During this time, the intruder who knocked on the door ran to the victims' bedroom, directly to a compartment in the rear corner of the room and took cash—proceeds from JM's drug sales—and JM's suboxone prescription.



Before the intruders left, however, Mr. Rich moved from his post in the stairwell to the threshold of the doorway (in the first image below, on the right of the three individuals standing in the center).  In the stipulation of facts, the parties agree that Mr. Rich did not appear to approach the victims beyond appearing at the doorway; the government does not agree that this act or position suggests some passivity.  He remained there, even as his armed accomplices left the apartment (second image below).  The group returned to their cars and, ultimately, to the Wal-Mart.





As the plea agreement stipulates, the robbery was committed pursuant to an agreement and conspiracy to rob a drug trafficker. Specifically, the object of the conspiracy and the robbery was marijuana suspected to be in JM's possession. In addition to this being the robbery's design, the intruders took a different controlled substance, suboxone, as well as the proceeds of marijuana sales.

A fuller depiction of the incident, which reflects conduct not specified in the plea agreement, exists via the internal surveillance video, which is the source of many of the images above. The government will submit the relevant excerpt of the video to chambers for the Court's consideration as an exhibit for the sentencing hearing.

Not referenced in the plea agreement but not appearing to be in dispute, given the representations of his sentencing memorandum, is Mr. Rich's post-arrest admission to his involvement. *See* Def.'s Sentencing Ltr., ECF 125 at 3.

### SENTENCING GUIDELINES CALCULATION

<u>Base offense level and agreed adjustments</u>

The government agrees in part with the guidelines calculations set forth in the presentence investigation report ("PSIR"). As stipulated in the plea agreement, Mr. Rich's base offense level

is 20, pursuant to United States Sentencing Guideline ("U.S.S.G.") 2B3.1(a).  PSIR at ¶ 20, ECF 123.  The offense level is subject to the following enhancements before any reductions:
- Five levels because a firearm was brandished during the commission of the offense (U.S.S.G. § 2B3.1(b)(2)(C);
- Four levels because a victim—namely, KC—sustained serious bodily injury (U.S.S.G. § 2B3.1(b)(3)(B);
- Two levels because a person (JM) was physically restrained to facilitate commission of the offense (U.S.S.G. § 2B3.1(b)(4)(B); and
- One level because the object of the offense was the taking of a controlled substance, and a (different) controlled substance was in fact taken during the commission of the offense (U.S.S.G. § 2B3.1(b)(4)(B).

PSIR at ¶¶ 21-24.

Notwithstanding the disputed adjustment discussed below, the government agrees that the offense should be adjusted down three levels for acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1(a), 3E1.1(b).  PSIR ¶¶ 26-27; ECF 111 ¶6(g).

The "mitigating role" adjustment

Disagreeing with the PSIR and Mr. Rich,[2] the government submits that a downward adjustment is not appropriate under U.S.S.G. § 3B1.2 ("mitigating role"), despite Mr. Rich not personally committing the more heinous aspects of the robbery.  Mr. Rich's knowledge and involvement were not so limited or compartmentalized to meet the Guidelines' intention.  As discussed below, this is evident by even his own concessions regarding how the plan formed and his knowledge of the other participants, as well as the reasonable inferences from those concessions and the act itself—namely the number of persons involved in traveling an hour to obtain a drug so commonly available in many places.

The Guidelines advise that the mitigating role adjustment applies to a "substantially less culpable than average participant in the criminal activity."  U.S.S.G. § 3B1.2 cmt. 3(A).  The examples of "substantially less culpable" involve a drug trafficking offense where a person is responsible for only what they personally transport or store (as opposed to the usual "reasonably foreseeable" calculus applied pursuant to U.S.S.G. § 1B1.3(a)(1)(B)) or a person unaware of the full scope of fraud in which they participated.  U.S.S.G. § 3B1.2 cmt. 3(A).  The Guidelines instruct that the following factors should be considered in applying the mitigating role adjustment:
- "the degree to which the defendant understood the scope and structure of the criminal activity";
- "the degree to which the defendant participated in planning or organizing the criminal activity";
- "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority";
- "the nature and extent of the defendant's participation in the commission of the criminal activity" and

---

[2] The plea agreement reserves the parties' right to dispute the applicability of U.S.S.G. § 3B1.2. ECF 111 at ¶ 6(f).

- "the degree to which the defendant stood to benefit from the criminal activity".

U.S.S.G. § 3B1.2 cmt. 3(C).

Mr. Rich, as the "lookout" for part of the robbery before standing in the doorway—and in the view of the victims, no doubt one more person present to worsen a frightening situation—was not substantially less culpable than the average participant in this offense. There are, roughly, three levels of participation here: the drivers (who did not leave the parking lot), the unarmed individuals at the apartment, and the armed individuals at the apartment.[3] In a broad sense, that would make him in the middle group, and arguably the average participant. In a more specific examination, most of the comment 3(C) factors weigh decisively against a role reduction here.

Instructive here is the Third Circuit's analysis involving the supposed lookout during an armed robbery. *United States v. Herring*, 588 Fed App'x 201 (3d Cir. Jan. 6, 2015) (unpublished). The Third Circuit identified three factors relevant to its consideration of a role adjustment: the nature of the defendant's relationship to other defendants, the importance of the defendant's acts to the crime's success, and the defendant's awareness of the offense's nature and scope. *Id.* at 203. The court then found the "minor role" adjustment inapplicable because Herring knew his co-defendants and had "as much knowledge of the enterprise leading up to the robbery as his fellow participants." *Id.* As to that second of the circuit's factors—importance of the role—the court identified three "distinct and important roles": driver, lookout, and "actual" robber. *Id.* On these facts, the reduction as to the "lookout" was unwarranted. *Id.*

In many ways, *Herring*'s application tracks the facts here. Mr. Rich understood the scope and structure of the criminal activity. As he stipulated, the robbery was committed pursuant to a conspiracy, and thus some pre-existing agreement before the defendants left the cars. Someone he identifies as a planner approached him about going to a place he'd never been—and an hour away—to "get" marijuana, which he apparently could obtain and sell without having to go to Elkton with two cars of people. Further, the meeting at Wal-Mart—the cars arriving, the individuals inside consolidating almost immediately, and the cars leaving immediately—suggests some coordination and advance knowledge before the group drove to Cecil County.

His sentencing letter supports, at the least, that he knew the robbery would be "by force," although the letter is coy about when exactly that moment of clarity arose. Def.'s Sentencing Ltr. at 2. Mr. Rich was, no doubt, part of the commission of the offense, as shown by his appearance on both internal and external video of the apartment. And under *Herring*, the "lookout" is as important as the "actual robber" for purposes of this Guidelines provision. Also, to the extent the Court finds the *Herring* factors relevant, Mr. Rich's pre-existing relationship with the other defendants weighs against adjustment. *See* 588 Fed. App'x at 203. Here, Mr. Rich not only knew at least three others—and thus personally knew the majority of his co-defendants—but he actively recruited two of them to join him. *See* Def.'s Sentencing Ltr. at 2 (admitting to being approached by one defendant and knowing two others before the robbery, and "engaging" one to drive to the robbery site).

---

[3] There is, perhaps, one exception to this categorization as to someone other than Mr. Rich.

Regarding one of the § 3B1.2 factors not addressed by *Herring*, the government submits that Mr. Rich stood to benefit from the activity, as he was engaged in drug trafficking leading up to and at the time of the offense. This conclusion finds support in both his own admission, Def.'s Sentencing Ltr. at 3, and evidence of that trafficking developed during an unrelated investigation identifying Mr. Rich as selling marijuana, *see* ECF 92, 94.[4] As a marijuana dealer, Mr. Rich had the knowledge and opportunity to then sell any drugs the intruders intended and expected to steal, or was otherwise in position split cash proceeds of the robbery.

For these reasons, the government disagrees with the PSR and submits that the Court should not adjust the Guidelines pursuant to U.S.S.G. § 3B1.2, and certainly not any more than the adjustment proposed in the PSR.

### The applicable Guidelines ranges

The government submits that the applicable Guidelines range should be 29. However, if the Court disagrees with the government's arguments, the final offense level is either 27, as set forth in the PSR, or 26 if the Court agrees with Mr. Rich's request for a three-level deduction under U.S.S.G. § 3B1.2. *See* Def.'s Sentencing Ltr. at 6.

Because Mr. Rich's criminal history category is I, the applicable guidelines ranges would therefore be:
- Under the government's position, 87-108 months,
- Under the PSR, 70-87 months; and
- Under Mr. Rich's position, 63-78 months.

### FACTORS SET FORTH IN 18 U.S.C. § 3553(A)

Based on the 18 U.S.C. § 3553(a), the government recommends a sentence of at least 72 months, and up to 87 months as the agreed maximum by the parties. The factors set forth in Title 18, United States Code, Section 3553(a) include: (1) the nature and circumstances of the offenses; (2) the history and characteristics of the Defendant; (3) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need for the sentence to afford adequate deterrence to criminal conduct; (5) the need for the sentence to protect the public from further crimes of the Defendant; (6) the need to provide the Defendant with educational and vocational training, medical care, or other correctional treatment in the most effective manner; (7) the kinds of sentences available; (8) the need to provide restitution to victims; and (9) the need to avoid unwarranted sentencing disparity among Defendants involved in similar conduct who have similar records. 18 U.S.C. § 3553(a).

Of course, the Sentencing Reform Act calls for a sentence sufficient but not greater than necessary to achieve Congress' goals for sentencing. In submitting this recommendation, the government recognizes Mr. Rich's personal acts in the unsettling offense and that he did not personally commit the more outrageous acts of the robbery. In any event, he played a key role in violating the sanctity of a family's home, and the sentence should reflect as much.

---

[4] These two documents are briefings related to Mr. Rich's motions for pretrial release. They explain in further detail the investigation into Mr. Rich and text messages suggesting his selling marijuana.

Nature and Circumstances of the Offense (3553(a)(1))

As discussed above, and recognized to some degree by Mr. Rich's sentencing letter, the facts of this offense are serious, to say the least.  The violation of the victims' privacy, the assault on the adults, the trauma imposed on the minor child—all reflect the horrors of armed robberies in the home, a place many look to for safety and comfort.  There is little dispute about the general nature and offensiveness of the robbery itself.

Where the parties continue to diverge is how involved Mr. Rich was and thus how much Mr. Rich should be accountable for the conduct as a whole.  Throughout the pendency of this matter, the government as maintained that Mr. Rich was not, as he contends, "passive" or in "the least" of roles.  Rather, his role was knowing and integral, and given his familiarity with drug trafficking, the sheer number of participants, and the nature of the act—a robbery at someone's home—he can hardly be viewed as someone unaware of how dangerous the enterprise could be.  By his own admission, he knew multiple participants and even obtained a second car and two others to join in the scheme.  There is no suggestion he was coerced or forced against his will on his way to meet at the Wal-Mart or in the hour it took to travel to the victims' residence.

Indeed, as recognized in an order denying pretrial release, Mr. Rich "knew what the plan was when he agreed to participate in the robbery[,] knew that there were multiple participants in the intrusion, and that they were forcing entry during the daytime into a residence which was likely to be occupied."  "The plan was elaborate, including the use of multiple vehicles, and the defendant, by his admitted knowledge of the planning of the home invasion, knew that this crime carried with it a substantial risk of injury to others."  ECF 99 at 4-5 (entered May 27, 2020).[5]

In light of the full scheme, it becomes easier to answer the questions raised in Mr. Rich's sentencing memorandum.  *See* Def.'s Sentencing Ltr. at 5.  According to that memorandum, Mr. Rich was a marijuana dealer approached about driving approximately an hour with six other people, spread across two vehicles, to "get" marijuana.  It is difficult to see how, given the relative ubiquity of marijuana, that proposition would not raise questions about the nature of the supposed acquisition.  His going along with it *and* securing a second car with two other acquaintances suggest that he wanted to go along with it (regardless of the reason) and had an out in opting not to join or in diverting the second car.  There being so many people involved indicated that at least a showing, if not the exercise, of force was necessary, if not advantageous.

As fair as it is to assume Mr. Rich's understanding and knowledge is as expansive as the Court's May 27 memorandum describes, it is equally fair that any sentence recognize that Mr. Rich did not wield a firearm or assault anyone physically.  Nor did he appear to have some pre-existing knowledge of the apartment such that he knew where the victim's drugs or proceeds might be located.  Without conceding that he was not a "planner," the government acknowledges that he was not the most egregious offender.

---

[5] The magistrate judge's based her description on both the parties' presentations during a detention hearing and subsequent briefing referencing the same facts and some of the photos included here.

But, for the same reasons discussed in *Herring* and the May 27 order, Mr. Rich's knowledge and involvement limit the benefits of not being on the front lines of this violence. Therefore, a sentence greater than the low end of the range is appropriate.

### History and Characteristics of the Offender (3553(a)(1))

Mr. Rich's criminal history is relatively, but not completely, not significant. His convictions involve trespass and traffic offenses, with a probation revocation for one of those offenses. PSR ¶¶ 35-36. Weighing in favor of some sentence mitigation is the absence of any convictions for firearms possession or any violent crimes. The government also recognizes that the circumstances surrounding his father, who is referenced in the defense memorandum, may have had a detrimental impact on Mr. Rich. However, the impact of this must be balanced by the seriousness and calculation of the offense. This was not a crime of opportunity in neighborhoods Mr. Rich's frequented.

### The Need for the Sentence to Reflect the Seriousness of the Offense, to Provide Just Punishment for the Offense, to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant (3553(a)(2))

The government's recommendation takes into consideration the seriousness of the offense, as described above; imposes punishment as called for by Congress; provides a means of deterrence given the sentence far exceeds prior periods of incarceration; and protects the public—including the specific victims who saw Mr. Rich on April 25, 2019—from any additional criminal conduct by Mr. Rich and his accomplices. As noted above, the seriousness of the crime can hardly be overstated. A sentence greater than the agreed floor but within the agreed range accounts for the severity of the offense without placing the full weight of its scope on his shoulders. The recommended sentence may be a deterrent, at least specifically as to Mr. Rich if not generally as to others, from committing similar conduct.

While disagreeing as to the passivity of Mr. Rich with respect to this offense, the government hopes that defense counsel is accurate in that Mr. Rich has already been deterred by his incarceration to date. And it remains the interest of the parties, the government, and the public that after his release, Mr. Rich steer clear of conduct that may bring him before the Court again. To that end, the government joins the recommendation for vocational training and any other educational or other opportunities that would provide a foundation for succeeding on any term of supervised release and thereafter.

*   *   *

The government believes that on the facts specific to Mr. Rich, including those summarized herein, a sentence of no less than 72 months, and up to 87 months, is sufficient but not greater than necessary to achieve the goals in 18 U.S.C. § 3553(a).

I thank the Court for its consideration of this matter.

> Very truly yours,
>
> Robert K. Hur
> United States Attorney
>
> _____/s/_____
> Charles Austin
> Assistant United States Attorney

cc: Robert Waldman, Esq., counsel for Antoine Rich